POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW WHITCOMB, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AFFIRM HOLDINGS, INC., MAX LEVCHIN, and MICHAEL LINFORD,<br><br>Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Matthew Whitcomb ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Affirm Holdings, Inc. ("Affirm" or the "Company"), analysts' reports and advisories about the Company, and

information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Affirm securities between February 12, 2021 and February 10, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Affirm operates a platform for digital and mobile-first commerce in the U.S. and Canada. The Company's platform includes point-of-sale payment solutions for consumers, merchant commerce solutions, and a consumer-focused app. Particularly, Affirm offers a payment service known as "buy-now, pay-later" ("BNPL"), which allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments. According to the Company, "[u]nlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties."

3. Affirm also maintains an official Twitter account, through which it publishes statements—or "tweets"—including periodic financial results.

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Affirm's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing

subjected Affirm to a heightened risk of regulatory scrutiny and enforcement action; (iii) Affirm maintained inadequate disclosure controls and procedures and internal control over financial reporting; (iv) accordingly, Affirm's tweet for its second quarter 2022 financial results contained selected metrics that made it appear that the Company had performed better than it actually did; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5. On December 16, 2021, the Consumer Financial Protection Bureau (the "CFPB") announced that it had launched an inquiry into Affirm's BNPL payment service, along with four other companies offering BNPL. The CFPB indicated that it was concerned about how BNPL leads to "accumulating debt, regulatory arbitrage, and data harvesting," and is seeking data on the risks and benefits of the products. In a statement addressing BNPL services, the CFPB Director stated, "[t]he consumer gets the product immediately but gets the debt immediately too."

6. On this news, Affirm's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021.

7. Then, at approximately 1:15 p.m. on February 10, 2022, Affirm issued a tweet from its official Twitter account, wherein the Company disclosed certain metrics from its second quarter 2022 financial results. The tweet, which was published prior to the Company's planned release of its financial results, portrayed a highly successful quarter, which included an increase in revenue of 77%. This caused Affirm's share price to spike nearly 10% in intra-day trading. The Company later deleted the tweet and released its full second quarter financial results ahead of schedule, which were lackluster, posting a loss of $0.57 per share, compared with analyst expectations of $0.37 per share.

8. On this news, Affirm's share price plummeted from an intra-day high of $83.57 per share on February 10, 2022, to close at $58.68 per share, or approximately 32%.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Affirm is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14. Plaintiff, as set forth in the attached Certification, acquired Affirm securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15. Affirm is a Delaware corporation with principal executive offices located at 650 California Street, San Francisco, California 94108. The Company's Class A common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the trading symbol "AFRM".

16. Defendant Max Levchin ("Levchin") has served as Affirm's Chairman of the Board of Directors and Chief Executive Officer at all relevant times. Levchin is also the founder of the Company.

17. Defendant Michael Linford ("Linford") has served as Affirm's Chief Financial Officer at all relevant times.

18. Defendants Levchin and Linford are sometimes referred to herein as the "Individual Defendants."

19. The Individual Defendants possessed the power and authority to control the contents of Affirm's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Affirm's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Affirm, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20. Affirm operates a platform for digital and mobile-first commerce in the U.S. and Canada. The Company's platform includes point-of-sale payment solutions for consumers, merchant commerce solutions, and a consumer-focused app. Particularly, Affirm offers a BNPL payment service, which allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments. According to the Company, "[u]nlike legacy payment options and our competitors'

product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties."

21. Affirm also maintains an official Twitter account, through which it publishes statements—or "tweets"—including periodic financial results.

**Materially False and Misleading Statements Issued During the Class Period**

22. The Class Period begins on February 12, 2021, the day after Affirm issued a post-market press release announcing the Company's fiscal year 2021 second quarter results. That press release quoted Defendant Levchin, who stated, in relevant part, that Affirm's "mission has been to build honest financial products that improve lives"; that "[w]e've aligned our success with the success of both sides of the commerce ecosystem, winning when our consumers . . . win"; and that "we remain committed to empowering consumers to take control of their finances[.]"

23. On February 17, 2021, Affirm filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended December 31, 2020 (the "2Q21 10-Q"). That filing represented, in relevant part:

> Affirm . . . provides consumers with a simpler, more transparent, and flexible alternative to traditional payment options. Our mission is to deliver honest financial products that improve lives . . . . Affirm enables consumers to confidently pay for a purchase over time . . . .
>
> . . . . Consumers get the flexibility to buy now and make simple monthly payments for their purchases and merchants see . . . an overall more satisfied customer base. Unlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties.

24. The 2Q21 10-Q also stated that Affirm "ha[d] developed policies and procedures designed to assist in compliance with [various federal and state consumer protection] laws and regulations[.]"

25. Appended as exhibits to the 2Q21 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2Q21 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] and that information contained in th[e 2Q21 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the issuer."

26. On May 10, 2021, Affirm issued a press release announcing the Company's fiscal year 2021 third quarter results. That press release quoted Defendant Levchin, who represented, in relevant part, that "Affirm's strong third quarter results reflect continued progress toward building the most . . . transparent financial network for consumers and merchants[.]"

27. On May 17, 2021, Affirm filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "3Q21 10-Q"). That filing contained substantively the same statements as referenced in ¶¶ 23-24, *supra*, regarding Affirm's purportedly transparent, simple, and trustworthy payment solutions for consumers, and policies and procedures designed to assist in compliance with various federal and state consumer protection laws and regulations.

28. Appended as exhibits to the 3Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

29. On September 9, 2021, Affirm issued a press release announcing its fourth quarter and fiscal year 2021 results. That press release quoted Defendant Levchin, who represented, in relevant part:

> The secular shift toward flexible and transparent financial products continues to accelerate. With our superior technology, Affirm is strongly positioned to build a more valuable two-sided network for consumers and merchants. We remain focused on extending our leadership position with our core products, while capitalizing on our vast opportunities to empower more people with the new ones we continue to launch.

30. On September 17, 2021, Affirm filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and fiscal year ended June 30, 2021 (the "2021 10-K"). That filing contained substantively the same statements as referenced in ¶¶ 23-24, *supra*, regarding Affirm's purportedly transparent, simple, and trustworthy payment solutions for consumers, and policies and procedures designed to assist in compliance with various federal and state consumer protection laws and regulations.

31. The 2021 10-K also assured investors that the Individual Defendants had "concluded that our disclosure controls and procedures were effective as of June 30, 2021" and that "[t]here have not been any changes in the Company's internal control over financial reporting . . . during the fourth quarter of fiscal 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, except" for certain changes that the Company had made to resolve a prior, purportedly remediated, material weakness in its internal controls.

32. Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

33. On November 10, 2021, Affirm issued a press release announcing the Company's fiscal year 2022 first quarter results. That press release quoted Defendant Levchin, who represented, in relevant part, that "[o]ur strong quarter once again demonstrates the continued momentum across Affirm as more people embrace the transparency, flexibility and value our solutions provide[.]"

34. The same November 10, 2021 press release also highlighted an expanded relationship with Amazon, whereby "[c]onsumers will have the option to split the total cost of eligible purchases into monthly payments at checkout with no late or hidden fees, ever[,]" and that, "[a]s part of an amended agreement, Affirm will serve as Amazon's only third party, non credit card, [BNPL] option in the U.S."

35. On November 15, 2021, Affirm filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2021 (the "1Q22 10-Q"). That filing contained substantively the same statements as referenced in ¶¶ 23 and 31, *supra*, regarding Affirm's purportedly transparent, simple, and trustworthy payment solutions for consumers, and effective disclosure controls and procedures and internal control over financial reporting.

36. Appended as exhibits to the 1Q22 10-Q were substantively the same SOX certifications as referenced in ¶ 25, *supra*, signed by the Individual Defendants.

37. The statements referenced in ¶¶ 22-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Affirm's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing subjected Affirm to a heightened risk of regulatory scrutiny and enforcement action; (iii) Affirm maintained inadequate disclosure controls and procedures and internal control over financial reporting; (iv) accordingly, Affirm's tweet for its second quarter 2022 financial results contained selected metrics that made it appear that the Company had performed better than it actually did; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

38. On December 16, 2021, the CFPB announced that it had launched an inquiry into Affirm's BNPL payment service, along with four other companies offering BNPL. Specifically, the CFPB stated, in relevant part:

> Today the [CFPB] issued a series of orders to five companies offering "buy now, pay later" (BNPL) credit. The orders to collect information on the risks and benefits of these fast-

growing loans went to [*inter alia*] Affirm . . . . The CFPB is concerned about accumulating debt, regulatory arbitrage, and data harvesting in a consumer credit market already quickly changing with technology.

"Buy now, pay later is the new version of the old layaway plan, but with modern, faster twists where the consumer gets the product immediately but gets the debt immediately too," said CFPB Director Rohit Chopra. "We have ordered [*inter alia*] Affirm . . . to submit information so that we can report to the public about industry practices and risks."

Buy now, pay later credit is a type of deferred payment option that generally allows the consumer to split a purchase into smaller installments, typically four or less, often with a down payment of 25 percent due at checkout. The application process is quick, involving relatively little information from the consumer, and the product often comes with no interest. Lenders have touted BNPL as a safer alternative to credit card debt, along with its ability to serve consumers with scant or subprime credit histories.

* * *

The law requires that the CFPB monitor consumer financial markets and enables the agency to require market players to submit information to inform this monitoring. The CFPB expects to publish aggregated findings on insights learned from this inquiry. Today's orders seek to illuminate the range of these consumer credit products and their underlying business practices. Specifically, the Bureau is concerned about:

- **Accumulating debt:** Whereas the old-style layaway installment loans were typically used for the occasional big purchase, people can quickly become regular users of BNPL for everyday discretionary buying, especially if they download the easy-to-use apps or install the web browser plugins. If a consumer has multiple purchases on multiple schedules with multiple companies, it may be hard to keep track of when payments are scheduled. And when there is not enough money in a consumer's bank account, this can potentially result in charges by both the consumer's bank and the BNPL provider. Because of the ease of getting these loans, consumers can end up spending more than anticipated.

- **Regulatory arbitrage:** Some BNPL companies may not be adequately evaluating what consumer protection laws apply to their products. For example, some BNPL products do not provide certain disclosures, which could be required by some laws. And while the BNPL application may look similar to a standard checkout with a credit card, protections that apply to credit cards may not apply to BNPL products. Many BNPL companies do not provide dispute resolution protections available to users of other forms of credit, like credit cards. And finally, depending on what rules the lender is following, different late fees and policies apply.

- **Data harvesting:** BNPL lenders have access to the valuable payment histories of their customers. Some have used this collected data to create closed loop shopping apps with partner merchants, pushing specific brands and products, often geared toward younger

audiences. As competitive forces pressure the merchant discount, lenders will need to find other sources of revenue to maintain growth and profitability. The Bureau would like to better understand practices around data collection, behavioral targeting, data monetization and the risks they may create for consumers.

The BNPL product has seen growth internationally and many other countries are also taking a close examination of its providers. As part of today's inquiry, the Bureau is working with its international partners in Australia, Sweden, Germany and the UK, specifically the Financial Conduct Authority. The Bureau will also be coordinating with the rest of the Federal Reserve System, as well as its state partners.

(Emphases in original.)

39. On this news, Affirm's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021. Despite this decline in the Company's stock price, Affirm's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of the Company's misrepresentations concerning the strength and accuracy of its financial reporting controls.

40. For example, Affirm planned to announce its financial results for the second quarter of fiscal year 2022 after the markets closed on February 10, 2022. That day, at approximately 1:15 p.m., however, Affirm's official Twitter account issued a tweet containing some of the Company's second quarter 2022 financial results (the "2Q22 Tweet"). That tweet stated: "Another great quarter in the books [ ] as we accelerated our growth. Leveraging our superior technology & putting people first = increasing total # of transactions by 218%, active consumers by 150%, GMV by 115%, & revenue by 77%! Tune in today at 2pm PT[.]"

41. The 2Q22 Tweet, which made it appear that Affirm had a highly successful quarter, caused Affirm's share price to jump roughly 10% in intra-day trading.

42. The statements referenced in ¶ 40 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made

false and/or misleading statements and/or failed to disclose that: (i) Affirm maintained inadequate disclosure controls and procedures and internal control over financial reporting; (ii) accordingly, the 2Q22 Tweet for Affirm's second quarter 2022 financial results contained selected metrics that made it appear that the Company had performed better than it actually did; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

43. Later, on February 10, 2022, Affirm deleted the 2Q22 Tweet and released its full second quarter 2022 financial results ahead of schedule. The full financial results were far less impressive than investors were led to believe from the 2Q22 Tweet. For example, Affirm posted a quarterly loss of $0.57 per share—far worse than analyst expectations of $0.37 per share.

44. Affirm's 2Q22 Tweet was materially false and misleading because it contained only selected metrics from the Company's second quarter 2022 financial results, which caused investors to believe that the Company had performed better than it actually did. The 2Q22 Tweet omitted material details, including that Affirm's quarterly loss was $0.57 per share, which was necessary in order to make the statement made not misleading.

45. It was severely reckless for Defendant to allow the misleading tweet to be sent during the market day.

46. On news of the deleted 2Q22 Tweet and subsequent release of the full earnings, Affirm's share price plummeted $24.89 per share from an intra-day high of $83.57 per share to close at $58.68 per share on February 10, 2022, or approximately 32%.

47. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

48. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Affirm securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Affirm securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Affirm or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Affirm;

- whether the Individual Defendants caused Affirm to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Affirm securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

54. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Affirm securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Affirm securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially

inflate and maintain the market price of Affirm securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Affirm securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Affirm securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Affirm's finances and business prospects.

61. By virtue of their positions at Affirm, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

62. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Affirm, the Individual Defendants had knowledge of the details of Affirm's internal affairs.

63. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Affirm. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Affirm's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Affirm securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Affirm's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Affirm securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

64. During the Class Period, Affirm securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Affirm securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Affirm securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Affirm securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

67. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68. During the Class Period, the Individual Defendants participated in the operation and management of Affirm, and conducted and participated, directly and indirectly, in the conduct of Affirm's business affairs. Because of their senior positions, they knew the adverse non-public information about Affirm's misstatement of income and expenses and false financial statements.

69. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Affirm's financial condition and results of operations, and to correct promptly any public statements issued by Affirm which had become materially false or misleading.

70. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Affirm disseminated in the marketplace during the Class Period concerning Affirm's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Affirm to engage in the wrongful acts complained of herein. The Individual

Defendants, therefore, were "controlling persons" of Affirm within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Affirm securities.

71. Each of the Individual Defendants, therefore, acted as a controlling person of Affirm. By reason of their senior management positions and/or being directors of Affirm, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Affirm to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Affirm and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Affirm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 1, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*